FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: LAMICTAL INDIRECT PURCHASER AND ANTITRUST CONSUMER LITIGATION | : : : : : | **OPINION** |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS | : : : : : | Civ. No. 12-5120 (WHW)(CLW) |

**Walls, Senior District Judge**

This putative class action concerns the legality of a settlement between two pharmaceutical companies. Plaintiffs are indirect purchasers of the drug lamotrigine, known by its brand name Lamictal, which was the subject of patent litigation between the Defendant pharmaceutical companies. Plaintiffs allege that the terms of the litigation settlement and the resulting sales of branded and generic versions of Lamictal violated federal and state antitrust and consumer protection laws. Defendants move to dismiss on various grounds, including that Plaintiffs' state law claims are time-barred, Plaintiffs fail to adequately plead several causes of action, and Plaintiffs' federal claims fail to allege a justiciable case or controversy. Decided without oral argument under Federal Rule of Civil Procedure 78(b), Defendants' joint motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the same set of circumstances as another case pending before this Court, *In re: Lamictal Direct Purchaser Antitrust Litig.*, Civ. No. 12-995 (D.N.J. 2012) (the "Direct Purchaser Class Action"), referenced by Plaintiffs in the amended complaint. Amended

FOR PUBLICATION

Complaint, ECF No. 38 at 1. The Court takes the following allegations from the amended

complaint as true.

Defendant GlaxoSmithKline ("GSK"), a pharmaceutical company, manufactures and

sells Lamictal Tablets and Lamictal Chewables, which treat epilepsy and bipolar disorder. ECF

No. 38 ¶¶ 1-2. From March 2007 to March 2008, GSK's domestic sales of Lamictal Tablets

exceeded $2 billion. *Id.* ¶ 2. During the same period, the lower-dosage Lamictal Chewables had

domestic sales of about $50 million. *Id.* GSK held a patent, U.S. Patent No. 4,602,017 (the "'017

patent"), for the active ingredient in Lamictal products, lamotrigine, that gave GSK the exclusive

right to sell Lamictal Tablets and Chewables until the patent expired on July 22, 2008. *Id.* ¶¶ 3,

59.

Defendant Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc.

(collectively, "Teva") is a pharmaceutical company that wanted to market a generic version of

Lamictal and filed applications with U.S. Food and Drug Administration ("FDA") seeking to do

so. *Id.* ¶ 3. GSK sued Teva in 2002 for patent infringement under Hatch-Waxman Act

procedures, Pub. L. No. 98-417, 98 Stat. 1585 (1984). *Id.* ¶¶ 4, 46-49, 65.

## I.   The Hatch-Waxman Act Procedures

The FDA must approve any new drug a manufacturer seeks to introduce onto the market.

21 U.S.C. § 355(a). To apply for approval, the manufacturer files a New Drug Application

("NDA") containing detailed information about the drug, its chemical composition, reports about

its safety and effectiveness as shown through extensive clinical trials, and descriptions of its

production and packaging processes. *Id.* § 355(b)(1). The application must also identify any

patent associated with the drug and its expiration date. *Id.* If the FDA approves the drug, it

publishes the drug and patent information in a book called "Approved Drug Products with

2

FOR PUBLICATION

Therapeutic Equivalence and Evaluations," commonly referred to as the "Orange Book." *Id.* § 355(j)(7)(A).

Generic drugs are therapeutically and pharmaceutically equivalent to corresponding brand name drugs and sold at lower prices. Congress passed the Hatch-Waxman Act in 1984 to encourage the entry of generics onto the market. A generic manufacturer may file an Abbreviated New Drug Application ("ANDA"), which does not need to contain the same level of detail as is required for an NDA. 21 U.S.C. § 355(j). The ANDA must make one of four certifications:

(1) that no patent information for the brand name drug has been filed;

(2) that the patent for the brand name drug has expired;

(3) that the patent will expire on a specifically identified date;

(4) that the "*patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.*"

21 U.S.C. § 355(j)(2)(A)(vii) (emphasis added).

Filing a certification under paragraph IV frequently leads to litigation because it constitutes a technical act of patent infringement. 35 U.S.C. § 271(e)(2)(A). If the applicant makes a certification under paragraph IV, the patent holder must be notified. 21 U.S.C. § 355(j)(2)(B). The patent holder then has 45 days to file an infringement lawsuit against the ANDA applicant. *Id.* § 355(j)(5)(B)(iii). When a suit is filed, the FDA stays the ANDA approval process until either (1) 30 months have run, or (2) the court decides that the patent is invalid or not infringed, whichever is earlier. *Id.*; ECF No. 38 ¶ 49.

Generic manufacturers are incentivized to be the first to file a paragraph IV certification because the first ANDA applicant to do so is granted a 180-day "exclusivity period." During that time, the FDA will not grant final approval to any other ANDA for the same generic drug. 21

FOR PUBLICATION

U.S.C. § 355(j)(5)(B)(iv); ECF No. 38 ¶ 50. For the first filer, the potential reward is half-a-year's period when it is the only generic drug company on the market competing with the brand name drug company. This 180-day exclusivity period is triggered by either the generic manufacturer's entry into the market with the drug or a court's final decision that the patent subject to the paragraph IV certification is invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv)(I); 21 C.F.R. § 314,107(c)(1); ECF No. 38 ¶ 50.

Another concept relevant to this case is pediatric exclusivity. Only a small fraction of drugs are tested on pediatric patients. To address this problem, the FDA will request that a drug company seeking to market drugs for pediatric use conduct pediatric trials. 21 U.S.C. § 355a.[1] If the company successfully completes the trials and the FDA accepts the results, then the FDA will award the company six months of additional market exclusivity (the "Pediatric Exclusivity"). In practical terms, this means that after a drug company's patent expires, the FDA will delay approval of generic ANDAs for another six months, essentially protecting the market from the entry of generics. *Id.* § 355a(c)(2).

**II. GSK's Patent Litigation with Teva**

Teva filed ANDAs with the FDA in 2002 seeking approval to manufacture and sell generic versions of lamotrigine tablets and chewables. ECF No. 38 ¶ 61. Teva was the first to file "substantially complete" ANDAs containing paragraph IV certifications that the '017 patent was invalid, unenforceable, and/or not infringed by Teva's proposed generic products, *id.* ¶ 62, giving Teva the potential right to a 180-day exclusivity period for sales of generic lamotrigine tablets and chewables. *Id.* ¶ 63. Teva gave notice to GSK of the paragraph IV certifications, and within

---

[1] Congress amended 21 U.S.C. § 355a in 2007. The Court cites to the pre-2007 version, which was the law at the relevant time.

4

FOR PUBLICATION

45 days GSK filed suit in the U.S. District Court for the District of New Jersey alleging that Teva's two ANDAs infringed the '017 patent. *Id.* ¶ 65. The FDA then automatically stayed the processing of Teva's ANDAs for 30 months. *Id.*

After discovery, the patent litigation culminated in a bench trial in January 2005. *Id.* ¶ 66. On the final day of trial, the Hon. John W. Bissell ruled from the bench that claim I of the '017 patent was invalid and indicated that a ruling on the validity of the three remaining claims would be issued. *Id.* ¶¶ 4, 67; *In re Lamictal Direct Purchaser Litig.*, 2012 WL 6725580, at *2 (D.N.J. Dec. 6, 2012) (Walls, J.). Claim I involved the chemical compound 3,5-diamino-6-(2,3-diocholorphenyl)-1,2,4-triazine. This is lamotrigine, the active ingredient in Lamictal products. *Id.*

### III. The Settlement

Following Judge Bissell's bench ruling, GSK and Teva quickly reached a settlement, formalized in a Settlement Agreement between GSK and Teva USA and a License and Supply Agreement between GSK and Teva Ltd. (collectively, "the settlement") signed on February 16, 2005. ECF No. 38 ¶ 75. The key terms were:

1) Teva was permitted to begin selling a limited number of generic lamotrigine chewables by June 1, 2005. *Id.* ¶ 76. This was approximately 37 months before the expiration of the '017 patent, and also before the FDA approved Teva's ANDA for lamotrigine tablets. *Id.* ¶ 64, 76, 77. GSK supplied the chewables to Teva, and Teva began selling them on May 25, 2005. *Id.*

2) Teva was permitted to begin selling generic lamotrigine tablets on July 21, 2008, the expiration date of the '017 patent. *Id.* ¶ 77.

3) GSK granted Teva an exclusive waiver of any Pediatric Exclusivity that might be granted
   to GSK, allowing Teva to begin selling generic lamotrigine tablets on July 21, 2008 even
   if GSK eventually received the additional six-month period of exclusivity. *Id.*

4) GSK further agreed not to launch its own authorized generic versions of Lamictal
   products until January 2009 by giving Teva an exclusive license until that time. *Id.* ¶ 81.

On April 4, 2005, the parties filed a Stipulation and Order of Dismissal seeking the
dismissal of all claims and counterclaims in the patent infringement lawsuit. *Id.* ¶ 87. The court
also entered an order withdrawing the bench ruling that invalidated claim I of the '017 patent. *Id.*

In 2007, GSK received a six-month Pediatric Exclusivity. This did not extend the
expiration date of the '017 patent, but it did prevent any ANDA applicant from receiving final
regulatory approval for a generic lamotrigine tablet, without invalidating or demonstrating that it
did not infringe the '017 patent, until January 22, 2009. *Id.* ¶ 60.

The FDA approved Teva's ANDAs for lamotrigine chewables and tablets on June 21 and
August 30, 2006, respectively. *Id.* ¶ 64. This approval date was significant because Teva
complied with the terms of the settlement: (1) Teva had already been selling GSK-supplied
lamotrigine chewables since May of 2005, *id.* ¶¶ 76. 78; and (2) Teva waited nearly two years
after receiving FDA approval, until July 21, 2008, to launch its generic version of lamotrigine
tablets. *Id.* ¶¶ 90. As the first ANDA filer to declare a paragraph IV certification, Teva was
guaranteed that no other generics could enter the market for 180 days after its own market entry
for lamotrigine tablets. *Id.* ¶ 92. Because Teva delayed its entry into the market, rather than
launching its generic lamotrigine tablets on August 30, 2006, GSK and other manufacturers did
not launch their own generic lamotrigine tablets until January 2009. *Id* ¶ 91.

FOR PUBLICATION

**IV. The Indirect Purchaser Class Action**

On February 17, 2012, plaintiffs in the Direct Purchaser Class Action filed a complaint in this Court, bringing five causes of action against GSK and Teva under the Sherman Antitrust Act. Civ. No. 12-995, ECF No. 1. On August 14, 2012, named Plaintiffs Carolyn McAnaney and the International Brotherhood of Electrical Workers Local 38, Health and Welfare Fund ("IBEW Local 38") filed a complaint on behalf of indirect purchasers of lamotrigine tablets, explicitly incorporating the factual allegations of the Direct Purchaser Class Action Complaint. ECF No. 1 ¶ 0. Plaintiffs filed an amended complaint in this action on February 5, 2013, adding the International Brotherhood of Electrical Workers Local 595, Health and Welfare Fund ("IBEW Local 595") as a named Plaintiff. ECF No. 38 ¶ 0.

Plaintiff McAnaney is a citizen of Suffolk County, New York who was a participant, member, or beneficiary in a health plan that required her to pay higher co-payments for brand-name drugs than for generics. In 2008, during the Class Period, Plaintiff McAnaney allegedly began purchasing generic lamotrigine tablets for personal use. *Id.* ¶ 18. Plaintiff IBEW Local 38 is a health and welfare fund located in Cleveland, Ohio that allegedly reimbursed or paid for its members' purchases of Lamictal tablets during the Class Period. *Id.* ¶ 19. Plaintiff IBEW Local 595 is a health and welfare fund located in Pleasanton, California that allegedly reimbursed or paid for its members' purchases of Lamictal tablets during the Class Period. *Id.* ¶ 20.

Plaintiffs' general claim is that Defendants' settlement unlawfully prevented competition in the lamotrigine tablet market. In exchange for receiving "reverse payments" from GSK in the form of (a) the right to sell lamotrigine chewables beginning in 2005 and (b) an eventual six-month exclusivity period for the sale of generic lamotrigine tablets, Teva agreed to (a) abandon the '017 patent litigation, which could have resulted in the invalidation of the patent, allowing

competitors to enter the market earlier, and (b) postpone the introduction of its generic lamotrigine tablets until 2008, also forestalling entry into the market by other competitors. *Id.* ¶¶ 80-81. Plaintiffs claim that the absence of competition in the lamotrigine tablet market led them to pay unlawfully high prices for the drug. *Id.* ¶ 84.

Plaintiffs assert ten causes of action under federal and state law on behalf of themselves, a national class of indirect purchasers, and separate classes of indirect purchasers harmed in New York, Michigan, and California. *Id.* ¶¶ 131-206. Plaintiffs allege that they and members of the indirect purchaser classes were harmed by Defendants' actions "during the Class Period of August 30, 2006, until the effects of Defendants' conduct . . . ceased or ceases" (the "Class Period"). *Id.* ¶ 1.

### A. The U.S. Indirect Purchaser Class claims

In the first three causes of action, all three Plaintiffs seek declaratory judgments under the Declaratory Judgment Act, on behalf of themselves and a class of "[a]ll persons or entities in the United States and its territories who indirectly purchased" Lamictal tablets from GSK or generic lamotrigine tablets from Teva during the Class Period (the "U.S. Indirect Purchaser Class"), that Defendants:

1) Engaged in price fixing of lamotrigine tablets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Count One"), *id.* ¶¶ 131-37;

2) Allocated the markets for Lamictal tablets and generic lamotrigine tablets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Count Two"), *id.* ¶¶ 138-46; and

3) Unlawfully restrained and monopolized trade and attempted to monopolize trade in the market for lamotrigine tablets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Count Three"). *Id.* ¶¶ 147-51.

### B. The New York Indirect Purchaser Class claims

In the fourth and fifth causes of action, Plaintiff McAnaney brings claims under New York state law on behalf of herself and all persons or entities who indirectly purchased Lamictal tablets from GSK or generic lamotrigine tablets from Teva "produced, manufactured, marketed, sold, or purchased in the state of New York" during the Class Period (the "New York Indirect Purchaser Class"). *Id.* ¶ 26. Plaintiff McAnaney alleges that:

1) Defendants entered into a "contract, agreement, arrangement, or combination to establish and maintain a monopoly in the conduct of trade or commerce [of lamotrigine tablets] in New York," in violation of New York's Donnelly Act, New York GBL § 340, et seq. ("Count Four"). *Id.* ¶¶ 152-161; and

2) Defendants' alleged anticompetitive conduct constituted "deceptive and misleading practices in the conduct of trade or commerce in New York," in violation of New York 's consumer protection statute, New York GBL § 349, et seq. ("Count Five"). *Id.* ¶¶ 162-170.

### C. The Michigan Indirect Purchaser Class Claims

In the sixth and seventh causes of action, Plaintiff IBEW Local 38 brings claims under Michigan state law on behalf of itself and all persons or entities who indirectly purchased Lamictal tablets from GSK or generic lamotrigine tablets from Teva "produced, manufactured, marketed, sold, or purchased in the state of Michigan" during the Class Period (the "Michigan Indirect Purchaser Class") *Id.* ¶ 27. Plaintiff IBEW Local 38 alleges that:

1) Defendants "engaged in a continuing illegal contract, combination, and conspiracy in restraint of trade" of lamotrigine tablets, in violation of Mich. Comp. Laws § 445.772 ("Count Six"). *Id.* ¶¶ 171-80; and

FOR PUBLICATION

2) Defendant GSK "unlawfully restrained and monopolized trade and attempted to monopolize trade for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices in the market for Lamictal Tablets," in violation of Mich. Comp. Laws § 445.773 ("Count Seven"). *Id.* ¶¶ 181-84.

**D.  The California Indirect Purchaser Class claims**

In the eighth and ninth causes of action, Plaintiff IBEW Local 595 brings claims under California law on behalf of itself and all persons or entities who indirectly purchased Lamictal tablets from GSK or generic lamotrigine tablets from Teva "produced, manufactured, marketed, sold, or purchased in the state of California" during the Class Period (the "California Indirect Purchaser Class") *Id.* ¶ 28. Plaintiff IBEW Local 595 alleges that:

1) Defendants engaged in a "combination to create or carry out restrictions in trade or commerce, and any agreement to fix the price of" lamotrigine tablets, in violation of California's Cartwright Act, California Bus. & Prof. Code § 16700, et seq. ("Count Eight"). *Id.* ¶¶ 185-88; and

2) Defendants' conduct constituted an "unlawful, unfair, or fraudulent business act or practice" in violation of California's Unfair Competition Law ("UCL"), California Bus. & Prof. Code § 17200, et seq. ("Count Nine"). *Id.* ¶¶ 189-92.

**E.  The unjust enrichment claim**

Finally, the three named Plaintiffs bring a claim on behalf of themselves and the U.S. Indirect Purchaser Class alleging that Defendants "violated the common law of unjust enrichment in New York, Michigan, California, and the laws of unjust enrichment across all the states and territories of the United States" ("Count Ten"). *Id.* ¶¶ 193-206.

FOR PUBLICATION

### V.  The motion to dismiss and the Direct Purchaser Class Action appeal

On December 6, 2012, this Court dismissed the Direct Purchaser Class Action, holding

that the complaint failed to allege that Defendants had made "reverse payments" and that

Defendants' actions were not subject to federal antitrust scrutiny. Direct Purchaser Class Action,

Civ. No. 12-995, ECF No. 105. The direct purchaser plaintiffs appealed, and on July 24, 2013,

the case was remanded to this Court for reconsideration in light of the Supreme Court's decision

in *FTC v. Actavis*, 133 S. Ct. 2223 (2013). Civ. No. 12-995, ECF No. 112. In *Actavis*, the

Supreme Court rejected the "quick look" standard under which district courts in the Third Circuit

had scrutinized "reverse payment settlements" under the Hatch-Waxman Act in favor of a more

exacting "rule of reason" test. *Actavis*, 133 S. Ct. at 2237.

On September 6, 2013, Defendants GSK and Teva filed separate motions to dismiss the

amended complaint in the Indirect Purchaser Class Action, arguing primarily that the complaint

did not allege that Defendants made "reverse payments" and that Defendant's actions were not

subject to federal or state antitrust scrutiny under the *Actavis* "rule of reason" test. ECF No. 46

(GSK); ECF No. 47 (Teva). Defendants mentioned, but declined to argue, additional state-law

grounds for dismissal, reserving the right to raise these arguments in a later motion for judgment

on the pleadings under Fed. R. Civ. P. 12(c). ECF No. 46 at 2 n.2; ECF No. 47 at 3. The Court

did not rule on the motion to dismiss, and the parties informally agreed to stay the Indirect

Purchaser Class Action pending the resolution of the "reverse payment" standard of review issue

in the Direct Purchaser Class Action. ECF No. 69 at 1.

On January 24, 2014, the Court affirmed its dismissal of the Direct Purchaser Class

Action, Civ. No. 12-995, ECF No. 129, and the direct purchaser plaintiffs appealed again. Civ.

No. 12-995, ECF No. 130. On July 26, 2015, the Third Circuit vacated the Court's dismissal and

FOR PUBLICATION

remanded the Direct Purchaser Class Action to this Court for further proceedings. Civ. No. 12-995, ECF No. 135-1. After considering a petition by Defendants for a rehearing, the Third Circuit amended its opinion, Civ. No. 12-995, ECF No. 135-2, and issued its mandate to the Court, vacating the dismissal and remanding the Direct Purchaser Class Action to this Court. Civ. No. 12-995, ECF No. 135-2.

On October 26, 2015, the Court held a status conference between parties in both actions, ECF No. 75, and Defendant GSK withdrew its motion to dismiss the amended complaint in the Indirect Purchaser Class Action in light of the developments in the Direct Purchaser Class Action. *See* Letter from Douglas S. Eakeley, Esq., ECF No. 72 at 3 (requesting status conference in part to discuss a "schedule for Defendants to re-brief the currently pending motions to dismiss the Indirect Purchaser action" to raise "state-specific grounds for dismissal").

## VI. The motion for judgment on the pleadings

On December 28, 2015, following a stipulated scheduling order signed by the Court on November 3, 2015, ECF No. 76, Defendants filed a joint motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) in the Indirect Purchaser Class Action. ECF No. 84. Defendants argue that (a) all of Plaintiffs' state law claims are barred by the applicable statutes of limitations, *id.* at 9-27; (b) Count Five, alleging a violation of New York's consumer protection statute, fails because Plaintiffs do not allege any deceptive, consumer-oriented acts that occurred in New York, *id.* at 27-31; (c) Counts Six, Seven, and the Michigan state portion of Count Ten fail because Plaintiffs do not have standing to assert Michigan state law claims, *id.* at 31-34; (d) Count Ten must be dismissed because the Michigan and New York unjust enrichment claims are time-barred, unjust enrichment is not a recognized cause of action in California, and Plaintiffs lack standing to assert unjust enrichment claims in other states, *id.* at 34-37; and (e) Counts One,

FOR PUBLICATION

Two, and Three fail because Plaintiffs fail to allege a justiciable "case or controversy." *Id.* at 37-38.

Plaintiffs filed a memorandum in opposition on February 11, 2016, ECF No. 89, and Defendants filed a reply brief on February 26, 2016. ECF No. 91. The Court grants Defendants' motion in part and denies it in part.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) allows a party to move for a judgment on the pleadings. A motion under Rule 12(c) is decided under the same standards which apply on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

In considering the plaintiff's claims, the Court may consider the allegations of the

FOR PUBLICATION

complaint, as well as documents attached to or specifically referenced in the complaint. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (3d ed. 2014). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).[2]

A court may also consider and take judicial notice of matters of public record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007); *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Such matters of public record may include prior judicial proceedings, *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009), filings with the SEC, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and other documents deemed to be public records by law, *Del. Nation v. Pennsylvania*, 446 F.3d 410, 414 n.6 (3d Cir. 2006).

A party that seeks to invoke the doctrine of fraudulent concealment to toll a statute of limitations must plead the circumstances of the fraudulent concealment with the particularity required by Fed. R. Civ. P. 9(b). *Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 549 (D.N.J. 2013) (citing *Kontonotas v. Hygrosol Pharm. Corp.*, 424 Fed App'x 184, 187 (3d Cir. 2011)). Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The purpose of

---

[2] "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004).

FOR PUBLICATION

Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in

order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false

or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d

Cir. 1998), *abrogation on other grounds recognized, Forbes v. Eagelson*, 228 F.3d 471 (3d Cir.

2000). Rule 9(b) "requires, at a minimum, that plaintiffs support their allegations of securities

fraud with all of the essential factual background that would accompany 'the first paragraph of

any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In*

*re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re*

*Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Plaintiffs "need not,

however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of

injecting precision and some measure of substantiation into their allegations of fraud.'" *Rolo*,

155 F.3d at 658 (citing *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d

Cir.1984)). The Third Circuit has cautioned that courts should "apply the rule with some

flexibility and should not require plaintiffs to plead issues that may have been concealed by the

defendants." *Id.* (citing *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir.

1983)).

A party moving for judgment on the pleadings under Rule 12(c) must demonstrate that

there are no disputed material facts and that judgment should be entered in its favor as a matter

of law. *See Jablonski v. Pan Amer. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir. 1988). When

reviewing a motion for judgment on the pleadings, the court must "view the facts presented in

the pleadings and the inferences to be drawn therefrom in the light most favorable to the

nonmoving party." *Id.*

FOR PUBLICATION

If a complaint fails to state a claim upon which relief can be granted, a plaintiff should ordinarily be granted the right to amend its complaint. The Supreme Court has instructed that "[t]he grant or denial of an opportunity to amend is within the discretion of the District court, but outright refusal to grant the leave without any justifying reason . . . is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  In the Third Circuit, plaintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile. *Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).[3]  In *Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000), the Third Circuit stated:

> [W]e suggest that district judges expressly state, where appropriate, that the plaintiff has leave to amend within a specified period of time, and that application for dismissal of the action may be made if a timely amendment is not forthcoming within that time. If the plaintiff does not desire to amend, he may file an appropriate notice with the district court asserting his intent to stand on the complaint, at which time an order to dismiss the action would be appropriate.

*Shane*, 213 F. 3d at 116 (citing *Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir. 1976)).

## DISCUSSION

### I.   Counts One through Three: the Sherman Act Declaratory Judgment Claims Allege Justiciable "Cases or Controversies."

In the first three causes of action, Plaintiffs seek declaratory judgments that Defendants violated provisions of the Sherman Act, 15 U.S.C. §§ 1, 2, by engaging in price fixing, allocation

---

3 The *Fletcher-Harlee* court stated that "to request leave to amend a complaint, the plaintiff must submit a draft amended complaint to the court so that it can determine whether amendment would be futile."  The court in *Fletcher-Harlee* also noted that the longstanding rule that leave to amend a complaint must be granted *sua sponte* stands in tension with the longer-standing rule that a plaintiff must submit a draft amended complaint to the court to allow the court to determine whether amendment would be futile.  *Fletcher-Harlee*, 482 F.3d at 252-53.

FOR PUBLICATION

of markets, and monopolization. ECF No. 38 ¶¶ 131-51. Defendants claim that Counts One

through Three must be dismissed because Plaintiffs have not alleged an actual "case or

controversy" for any claim. ECF No. 84 at 37. The Court disagrees.

Defendants state correctly that the Declaratory Judgment Act "does not serve as an

independent basis for federal jurisdiction." *Id.* (citing *Corzine v. 2005 Def. Base Closure &

Realignment Comm'n*, 388 F. Supp. 2d 446, 449 (D.N.J. 2005)). Because federal courts are not

authorized to render advisory opinions, a plaintiff bringing a valid claim for declaratory

judgment under 28 U.S.C. § 2201 must establish a "substantial controversy, between parties

having adverse legal interests," under some recognized cause of action, for the court to exercise

jurisdiction. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

This does not mean that Plaintiffs must actually bring a claim under the recognized cause

of action. That Plaintiffs "seek[ ] a declaratory judgment and not damages or injunctive relief

does not automatically preclude" their claim. *Acme Markets, Inc. v. Wharton Hardware and

Supply Corp.*, 890 F. Supp. 1230, 1236 (D.N.J. 1995). "Where the court would have jurisdiction

to entertain [Plaintiffs'] antitrust claims if an injunction or money damages were sought, the

court has jurisdiction to entertain a declaratory judgment action alleging violation of the same

statutes." *Id.* (citing *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *Jersey Central Power &

Light Co. v. Local Unions*, 508 F.2d 687, 699 n.31 (3d Cir.), *cert. denied*, 425 U.S. 998 (1975)).

Defendants are correct that, in *Illinois Brick v. Illinois*, the Supreme Court held, as a

matter of law, that indirect purchasers of price-fixed products do not suffer "injury" within the

meaning of Section 4 of the Clayton Act, the statute that allows private plaintiffs to bring an

action seeking treble damages for violations of the Sherman Act. 431 U.S. 720, 728-29 (1977).

This cause of action would not be available to the Plaintiffs here.

FOR PUBLICATION

But "direct purchaser status is not mandated" to bring claims under Section 16 of the Clayton Act, which allows plaintiffs to seek injunctive relief for the same Sherman Act violations. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399-400 (3d Cir. 2000) (explaining that "a claim for injunctive relief does not present the countervailing considerations – such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses – that the Supreme Court emphasized when limiting the availability of treble damages.") (quoting *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 590 (3d Cir. 1979)). Because Plaintiffs are not automatically barred by their status as indirect purchasers from bringing a Section 16 claim for injunctive relief, they are not automatically barred from bringing claims under the Declaratory Judgment Act.

Even though "direct purchaser status is not mandated, the class must still make a showing of entitlement to injunctive relief requiring the demonstration of: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfarin Sodium*, 214 F.3d at 400. The Court finds that Plaintiffs' allegation that the settlement agreement between GSK and Teva led them to pay inflated prices for lamotrigine tablets is sufficient to meet this standard. *See id.* (finding that the claim of indirect purchasers of the drug Coumadin that defendant's "conduct precluded competition which caused Coumadin users to pay inflated prices for the drug" met this standard) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)). The Declaratory Judgment Act claims present justiciable cases or controversies.

## II. The State Law Antitrust and Unfair Competition Claims Are Time-Barred.

Defendants argue that Counts Four through Nine, Plaintiffs' state law antitrust and unfair competition claims, are all time-barred under the applicable statutes of limitations. ECF No. 84 at 9. In a section of the amended complaint entitled "Fraudulent Concealment and Equitable

FOR PUBLICATION

Tolling," Plaintiffs argue that all of their claims are timely because Defendants "engaged in deceptive, misleading, and fraudulent efforts to conceal the true nature of their unlawful conduct from Plaintiffs and the Classes through acts of omission, partial disclosures omitting material facts, and misrepresentations," tolling the relevant statutes of limitations "equitably and/or as a result of Defendants' fraudulent concealment, at least until February 17, 2012." ECF No. 38 ¶¶ 99, 123.

When a plaintiff's claims in federal court are based on state law, the court must apply the forum state's choice of law rules to determine which substantive state laws to apply to the claims. *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 444 (D.N.J. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). New Jersey has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws, which requires the court first to examine the substance of the potentially applicable laws in order to determine if an actual conflict exists. *Id.* (citing *P.V. v. Camp Jaycee*, 197 N.J. 132, 142-43 (N.J. 2008)). If a conflict exists, the court must determine which jurisdiction has the "most significant relationship" to the claim. *Id.* (citing *Camp Jaycee*, 197 N.J. at 136). Here, the separate named Plaintiffs bring causes of action under New York, Michigan, and California state statutes on behalf of separate Classes harmed in each of those states. The Court finds that New York has the "most significant relationship" to the New York causes of action, Michigan to the Michigan causes of action, and California to the California causes of action. The Court will apply the respective substantive laws of those states, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including state statutes of limitations, *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945), to the state law causes of action.

FOR PUBLICATION

Plaintiffs claim that the New York, Michigan, and California fraudulent concealment standards are all "substantially the same" as the Third Circuit's standards for fraudulent concealment of federal antitrust and consumer protection claims. ECF No. 89 at 13. As the Court will discuss, this is an oversimplification not supported by case law. Because each state has its own statutes of limitations, accrual rules, and tolling principles, the Court will discuss the timeliness of Counts Four through Nine on a state-by-state basis. At the outset, is to be noted that "[t]he taxonomy of tolling, in the context of avoiding a statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel," and that "the reported decisions of the federal and state courts do not always mean the same thing by their use of these phrases, and phrases to which some judges ascribe different meanings are used interchangeably by other judges." *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002). Several terms used in this discussion carry different meanings under New York, Michigan, and California law.

### A. Counts Four and Five: the New York Donnelly Act and consumer protection claims are time-barred.

Defendants argue that the New York state law claims alleged in Counts Four and Five are time-barred. ECF No. 84 at 9-10. This Court agrees.

### 1. The causes of action accrued outside of the limitations period.

Count Four charges Defendants with violating New York's Donnelly Act, GBL §340 et seq., ECF No. 38 ¶¶ 152-61, and Count Five charges defendants with violating New York's consumer protection law, New York GBL § 349. *Id.* ¶¶ 162-70. The limitations period for Donnelly Act claims is four years, and the limitations period for the consumer protection law is three years, with both causes of action accruing at the time of the injury. N.Y. Gen. Bus. Law §

FOR PUBLICATION

340(5); *Thome v. Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 32-33 (N.Y. App. Div. 2009) (Donnelly Act); *Corsello v. Verizon New York, Inc.*, 967 N.E. 2d 1177, 1184 (N.Y. 2012); *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201 (N.Y. 2001) (New York consumer protection law).

In cases challenging similar prescription drug "reverse payment" settlements, courts have held that federal and state law causes of action for anticompetitive actions and unfair competition accrued at the time the challenged settlements began to prevent generic competition. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 300 (D. Mass. 2014); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 219 (E.D.N.Y. 2003); *In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp. 363, 378, 380 (S.D.N.Y. 2002).

According to the amended complaint, Teva received final approval from the FDA for its generic lamotrigine tablets on August 30, 2006 and immediately could have begun selling those tablets, either "at-risk" of litigation from GSK or under a favorable ruling from the patent litigation court. ECF No. 38 ¶ 71. Under the terms of the settlement, instead of marketing generic lamotrigine tablets "well before July 2008," *id.* ¶ 157, Teva agreed to "allocate all sales of Lamictal Tablets in the United States to [GSK] until July 21, 2008." *Id.* ¶ 155. Because of this, "Plaintiff McAnaney and the New York Indirect Purchaser Class were deprived of the opportunity to purchase lower-priced, generic lamotrigine tablets" and were eventually forced to pay inflated prices for Teva-exclusive generic tablets. *Id.* ¶ 165. The Court agrees with Defendants that Plaintiffs' Donnelly Act and New York consumer protection law claims accrued on August 30, 2006, when the settlement agreement began to prevent generic competition. This is well outside the four- and three-year limitations periods for those claims. ECF No. 84 at 11.

FOR PUBLICATION

### 2. Tolling exceptions do not apply to the New York claims.

The amended complaint's "Fraudulent Concealment and Equitable Tolling" section arguably describes two principles recognized by New York courts that toll the limitations period for causes of action that have already accrued: the "continuing violation" doctrine and the doctrine of "equitable tolling/equitable estoppel." This Court finds that neither doctrine renders Plaintiffs' claims timely.

### a. The Continuing Violation Doctrine does not apply.

New York's "continuing violation" doctrine is "usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." *Selkirk v. New York*, 249 A.D. 2d 818, 819 (N.Y. App. Div. 1998). The doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." *Thomas v. City of Oneonta*, 90 A.D. 3d 1135, 1136 (N.Y. App. Div. 2011) (quoting *Selkirk*, 249 A.D. 2d at 819).

In *Bullard v. New York*, the Appellate Division declined to apply the continuing violation doctrine in another case where plaintiffs claimed to suffer the effects of an earlier anticompetitive agreement. 307 A.D 2d 676 (N.Y. App. Div. 2003). There, the plaintiffs were recipients of telephone calls from inmates of correctional facilities who brought Donnelly Act and General Business Law § 349 claims against the New York Department of Correctional Services ("DOCS") challenging an allegedly unlawful agreement between the DOCS and its telephone services provider. *Id.* at 678. Although plaintiffs characterized "the damages sustained after every completed telephone call as continuing unlawful acts," *id.*, the court found that the calls were "more appropriately viewed as the continuing effects" of the challenged telephone services contract and refused to apply the continuing violation doctrine. *Id.*

22

FOR PUBLICATION

Similarly, the "continuing unlawful acts" that Plaintiffs allege here – the New York class

members' purchases of generic and branded lamotrigine tablets at artificially inflated prices – are

more appropriately viewed as the "continuing effects" of the allegedly unlawful settlement

agreement made in 2005. Because of this, the continuing violation doctrine does not toll the

running of the limitations period.

### b.  The doctrine of equitable tolling/equitable estoppel does not apply.

New York recognizes two, sometimes interchangeable fraudulent concealment doctrines.

The doctrine of "[e]quitable tolling applies where a defendant's fraudulent conduct results in a

plaintiff's lack of knowledge of a cause of action," while the doctrine of "[e]quitable estoppel, on

the other hand, permits the tolling of the statute of limitations in extraordinary circumstances

where the plaintiff knew of the existence of his cause of action, but the defendant's misconduct

caused the plaintiff to delay in bringing suit." *Marshall v. Hyundai Motor America*, 51 F. Supp.

3d 451, 462-63 (S.D.N.Y. 2014) (citing *Pearl*, 296 F.3d at 82; *Conklin v. Jeffrey A.*

*Maidenbaum, Esq.*, 2013 WL 4083279, at *5 (S.D.N.Y. Aug. 13, 2013)). Sometimes, however,

"New York appears to use the label 'equitable estoppel' to cover both the circumstances 'where

the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the

plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after

the period of limitations has expired.'" *Pearl*, 296 F.3d at 83 (citing Joseph M. McLaughlin,

*Practice Commentaries*, N.Y. C.P.L.R. C201:6 at 63 (McKinney 1990)) (comparing federal

fraudulent concealment doctrine and New York equitable estoppel doctrine).

For a court to apply the doctrine of equitable tolling/estoppel, "[a] plaintiff must establish

that 'the defendant wrongfully concealed material facts' which 'prevented plaintiff's discovery

of the nature of the claim,' and that the 'plaintiff exercised due diligence in pursuing the

23

FOR PUBLICATION

discovery of the claim during the period plaintiff seeks to have tolled.'" *Marshall*, 51 F. Supp. 3d

at 462 (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012)); *see also*

*Zumpano v. Quinn*, 6 N.Y. 3d 666, 674 (N.Y. 2006) (doctrine of equitable estoppel applies

"where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a

timely action," and where plaintiff demonstrates "reasonable reliance on the defendant's

misrepresentations.") (quoting *Simcuski v. Saeli*, 44 N.Y.2d 442, 449 (N.Y. 1978)).

     The New York Court of Appeals has rejected attempts to apply the doctrine of equitable

tolling/estoppel to "any lapsed claim where the defendant inflicted some type of injury upon a

knowing plaintiff but failed to come forward with further information about his or her

wrongdoing." *Id.* Instead, it is "fundamental to the application of equitable estoppel for plaintiffs

to establish that subsequent and specific actions by defendants somehow kept them from timely

bringing suit." *Id.* (citing *Matter of Steyer*, 70 N.Y.2d 990, 993 (N.Y. 1988)). "A wrongdoer is

not legally obliged to make a public confession, or to alert people who may have claims against

it, to get the benefit of a statute of limitations." *Id.* at 675. "If a plaintiff cannot 'articulate any

acts by defendants that prevented him from timely commencing suit' then he has 'failed to meet

his burden of showing that he was wrongfully induced by defendants not to commence suit.'"

*Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Doe v. Holey See (State of Vatican*

*City)*, 793 N.Y.S. 2d 565, 569 (N.Y. App. Div. 2005)) (internal alterations omitted).

     As an initial matter, Plaintiffs claim that New York antitrust violations are inherently

"self-concealing," automatically tolling the limitations period, ECF No. 89 at 14, but the cases

they advance only address anticompetitive "bid-rigging" schemes. *See People v. Liberty Mut.*

*Ins. Co.*, 52 A.D. 3d 378, 379 (N.Y. App. Div. 2008) (citing *State of N.Y. v. Hendrickson Bros.,*

*Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)); *New York v. Feldman*, 2003 WL 21576518, at * 5

FOR PUBLICATION

n.15 (S.D.N.Y. July 10, 2003) (citing *Hendrickson*, 840 F.2d at 1083)). Plaintiffs do not allege

that Defendants engaged in a bid-rigging scheme, and the Court will not extend these holdings

outside their original context.

Plaintiffs also argue that the statutes of limitations for the New York claims were tolled

because Defendants fraudulently concealed "the anti-competitive nature of the Agreements

challenged in this action, and other material facts (including, but not limited to, the Patent

Litigation court's ruling that the first claim of [the] '017 patent was unenforceable and not

infringed by Teva's ANDA)." ECF No. 38 ¶¶ 109, 114. Plaintiffs claim that Defendants' SEC

filings, press releases, and other documents discussing the settlement or Teva's eventual

marketing of generic lamotrigine tablets omitted material details that concealed the true nature of

the settlement agreement. *Id.* ¶¶ 100-122. In particular, Plaintiffs argue that Defendants failed to

disclose GSK's agreement not to market its own authorized generic lamotrigine tablet during

Teva's 180-day exclusivity period, referred to by Plaintiffs as the "No-AG Commitment." ECF

No. 89 at 6, 17-18.

The Court finds that any equitable tolling alleged by Plaintiffs does not preserve their

claims. Both Teva and GSK made public filings with the SEC and issued press releases that,

though they did not include the *full* terms of the settlement, did disclose material facts sufficient

to inform Plaintiffs of the nature of their claims, or at least to allow them to discover the claims

with reasonable diligence. *See* ECF No. 38 ¶ 114 (citing GSK 2005 Form 20-F, filed on March 3,

2006, disclosing that GSK had filed an action in the District of New Jersey to enforce the

lamotrigine patent expiring in 2009, that Teva had filed an ANDA with a certification of

invalidity, and that the parties had "reached a settlement agreement pursuant to which [GSK] has

granted Teva an exclusive royalty-bearing license to distribute in the USA a generic version of

FOR PUBLICATION

lamotrigine chewable tablets" and "the exclusive right to manufacture and sell Teva's own

generic version of lamotrigine tablets in the USA with an expected launch date in 2008"); *id.* ¶

116 (citing GSK 2006 Form 20-F containing "substantially similar statements"); *id.* ¶ 109 (citing

Teva 2005 Form 20-F, filed on or about March 20, 2006, disclosing that in February 2005, "as

settlement of a patent dispute" over lamotrigine, "GSK granted Teva an exclusive royalty-

bearing license to distribute generic lamotrigine chewable tablets . . . in the United States no later

than June 2005 [and] . . . the exclusive right to manufacture and sell its own generic version of

lamotrigine tablets . . . with an expected launch in 2008 prior to patent expiry in July 2008 (plus

six months of expected pediatric exclusivity.")); *id.* ¶112 (citing Teva 2007 and 2008 Forms 20-

F containing "substantially similar statements"); *id.* ¶ 113 (citing Teva press release and Form 6-

K, filed on July 22, 2008, announcing that, as part of a February 2005 "agreement to settle patent

litigation," GSK had granted Teva a license to sell generic lamotrigine tablets "during the six

month pediatric exclusivity period which ends on January 22, 2009.").

Additionally, though Defendants do not dispute that they did not disclose Judge Bissell's

invalidation of the first claim of the '017 patent, they also did not conceal the invalidation; the

court's ruling and withdrawal of the ruling are both publicly available documents. *See*

*SmithKline Beecham v. Teva Pharms.*, Civ. No. 02-3779, ECF No. 86 (Minute entry from

January 27, 2005 noting that "Court declared Claim One of the Patent at issue is invalid.

Decision Reserved as to other claims"); Civ. No. 02-3779, ECF No. 88 (order withdrawing

bench ruling). In a similar case, the Southern District of New York held that the federal

fraudulent concealment doctrine did not render federal antitrust claims timely in action related to

reverse-payment settlement of pharmaceutical patent litigation in part because the "fact that the

parties had been disputing the validity of the '763 patent and that the district court had initially

26

FOR PUBLICATION

found the '763 patent invalid were also public and could have been discovered in the exercise of

due diligence." *In re Buspirone*, 185 F. Supp. 2d at 379-80. The Court finds this reasoning

persuasive and reaches the same conclusion here with regard to New York's equitable

tolling/equitable estoppel doctrine. Plaintiffs fail to plead with any specificity that facts related to

(a) the invalidation of the '017 patent, (b) Teva's right to sell lamotrigine chewables in 2005,

and (c) Teva's right to sell lamotrigine tablets in 2008 were concealed by Defendants.

The only material fact that Defendants arguably failed to disclose in their press releases

and public filings was the existence of the No-AG Commitment. The Court agrees with Plaintiffs

that the term "exclusive," as used in press releases and filings disclosing Teva's license to sell

lamotrigine tablets in 2008, did not clearly indicate that GSK had agreed not to sell its own

generic lamotrigine tablets during the time period, and the No-AG Commitment is part of the

allegedly anticompetitive conduct upon which Plaintiffs bring their claims. ECF No. 89 at 19.

But Plaintiffs acknowledge that the terms of the No-AG Commitment were publicly

disclosed in a 2008 lawsuit in the District of New Jersey between Teva and GSK. *Id.* at 9, 23

(citing *Teva Pharm. Indus. Ltd. v. SmithKline Beecham Corp.*, No. 08-cv-3706, ECF No. 10

(D.N.J. Oct. 6, 2008)).[4] Plaintiffs claim that Teva's initial complaint did not fully disclose the

terms of the No-AG Commitment because Teva did not attach a copy of the settlement

agreement, although Defendants point out that Teva's complaint specifically alleged that "GSK

[agreed it] would not sell a generic equivalent for a limited period of time." ECF No. 91 at 1

---

[4] Plaintiffs argue that a 2011 report about no-AG agreements published by the FTC "was the impetus for knowledge" that such agreements were anticompetitive and point to this Court's own 2014 ruling in favor of defendants in the Direct Purchaser Action as further evidence that they couldn't have known they had a cause of action regarding the No-AG Commitment any earlier. ECF No. 89 at 22. But the equitable estoppel doctrine, like other fraudulent concealment doctrines, applies when a defendant conceals "material *facts*," *Marshall*, 51 F. Supp. 3d at 462 (emphasis added), not to legal conclusions about those facts.

FOR PUBLICATION

(citing No. 08-cv-3706, ECF No. 1 ¶ 2 (July 23, 2008)). In any event, Plaintiffs admit that GSK

filed a redacted copy of the settlement agreement containing the material terms of the No-AG

Commitment in October 2008. ECF No. 89 at 9, 23 (citing Civ. No. 08-3706, ECF No. 10).

Even assuming that the three-year limitations period for Plaintiffs' New York consumer

protection claim was tolled until either (a) July 23, 2008, when Teva's complaint against GSK

was filed, or (b) October 6, 2008, when GSK filed a copy of the settlement agreement, the claim

expired before Plaintiffs filed their initial complaint in this case on August 14, 2012. And even

assuming that the four-year limitations period for Plaintiffs' Donnelly Act claim was tolled *and*

that the tolling continued until October 6, 2008, Plaintiffs fail to justify waiting nearly four years

to file their Donnelly Act claim. The "burden is on the plaintiff[s] to establish that the action was

brought within a reasonable time after the facts giving rise to the estoppel have ceased to be

operational," *Simcuski*, 44 N.Y.2d at 450. Plaintiffs fail to meet that burden. Counts Four and

Five are dismissed as time-barred.

## B. Counts Six and Seven: the Michigan Antitrust Reform Act claims are time-barred.

For similar reasons, the Michigan Antitrust Reform Act claims asserted in Counts Six and

Seven of the amended complaint are time-barred. ECF No. 84 at 9-10.

### 1. The causes of action accrued outside of the limitations period.

Counts Six and Seven charge Defendants with violating two provisions of the Michigan

Antitrust Reform Act, Mich. Comp. Laws § 445.772 (Count Six), ECF No. 38 ¶¶ 171-80, and

Mich. Comp. Laws § 445.773 (Count Seven). *Id.* ¶¶ 181-84. The limitations period for claims

under the Michigan Antitrust Reform Act is four years. Mich. Comp. Laws § 445.781(2). In

Michigan, "a claim accrues at the time the wrong upon which the claim is based was done,

FOR PUBLICATION

regardless of the time damage results." *Nelson v. Ho*, 564 N.W.2d 482, 487 (Mich. Ct. App. 1997). For the reasons discussed, the "time the wrong upon which the claim is based was done" was August 30, 2006.

In a section titled "Continuing Harm and Inury" [sic], Plaintiffs allege that they "were harmed and suffered separate injuries and claims against Defendants each and every time Plaintiff and each member of the Class purchased Lamictal Tablets . . . during the Class Period." ECF No. 38 ¶ 124. Plaintiffs also allege that Defendants' settlement was a "continuing illegal contract, combination, and conspiracy in restraint of trade." *Id.* ¶¶ 133, 140, 155, 173.

In the past, Michigan courts have recognized exceptions to the general accrual rule known as the "continuing wrong" and "continuing-wrongful-acts" doctrines. There is apparent confusion in Michigan and federal courts about the difference between the two doctrines, but the "continuing wrong" doctrine governs accrual when a claim arises from the continuing wrongful effects of a past act. The continuing wrong doctrine's "limited application" has only been recognized in cases of trespass, nuisance, and civil rights violations. *Attorney General ex rel Dept. of Environmental Quality v. Bulk Petroleum Corp.*, 276 Mich. App. 654, 667 (Mich. Ct. App. 2007) (citing *Blazer Foods v. Restaurant Properties, Inc.*, 259 Mich. App. 241, 247 (Mich. Ct. App. 2003)). Recently, Michigan courts have abrogated the doctrine in all these contexts. *See Garg v. Macomb Community Health Services*, 472 Mich. 263, 284-85 (Mich. 2005) (holding that continuing violations doctrine does not apply in civil rights cases); *Marilyn Froling Revocable Living Trust v. Bloomfield Hills Country Club*, 283 Mich. App. 264, 285 (Mich. Ct. App. 2009) (Extending *Garg* "beyond the context of civil rights claims to completely abrogate the continuing wrongs doctrine in trespass and nuisance actions as well."). Though Michigan courts

FOR PUBLICATION

have not expressly abrogated the continuing wrong doctrine entirely, this Court declines to reverse the trend and extend the doctrine to a previously unrecognized type of action.

To the extent, as Plaintiffs argue, that the "continuing-wrongful-acts" doctrine is a separate concept that has not been abrogated, ECF No. 89 at 30 (citing *Taylor Land Grp., L.L.C. v. BP Products N. Am., Inc.*, 2011 WL 2119670, at *12 (Mich. Ct. App. May 26, 2011)); *but see Guastello v. Lafon*, 2014 Mich. App. LEXIS 1807, at *10 (Mich. Ct. App. Sept. 23, 2014) (holding that *Taylor Land Grp.* was wrongly decided based on a false distinction between "continuing wrongs" and continuing wrongful acts), the doctrine provides that when a defendant's wrongful acts are of a continuing nature, the "period of limitation will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that the defendant's tortious conduct continues." *Horvath v. Delida*, 213 Mich. App. 620, 626 (Mich. Ct. App. 1995) (citing *Oakwood Homeowners Ass'n, Inc. v. Ford Motor Co.*, 77 Mich. App. 197, 220 n.7 (Mich. 1977)).

This doctrine is inapplicable here. "A continuing wrong is established by continual tortious *acts*, not by continual harmful effects from an original, completed act." *Horvath*, 213 Mich. App. at 627 (emphasis in original). Here, although Plaintiffs allege that they suffered the continued harmful effects of Defendants' allegedly unlawful agreement from 2005 to 2009, ECF No. 38 ¶¶ 124, 133, 140, 155, 173, the unlawful settlement itself was an "original, completed act" that occurred in 2005. Merely calling the agreement a "continuing illegal contract" does not make it so. This Court finds that Plaintiffs' Michigan Antitrust Reform Act claims accrued on the date of harm, August 30, 2006, more than four years before the filing of the complaint.

2. **Michigan's Fraudulent Concealment statute does not make Plaintiffs' claims timely.**

Section 600.5855 of the Michigan Compiled Laws codifies Michigan's fraudulent concealment doctrine:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855.

"Absent a fiduciary relationship, fraudulent concealment extends the applicable limitations period only when the defendant has made an affirmative act or representation. 'The plaintiff must show that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery.'" *Dillar v. Schlussel*, 308 Mich. App. 429, 443 (Mich. Ct. App. 2014) (quoting *Prentis Family Foundation v. Barbara Ann Karmanos Cancer Institute*, 266 Mich. App. 39, 48 (Mich. Ct. App. 2005)). "Mere silence is insufficient." *Prentis Family Foundation*, 266 Mich. App. at 48 (citing *Sills v. Oakland General Hosp.*, 220 Mich. App. 303, 310 (Mich. Ct. App. 1996)).

Additionally, a plaintiff is "required to exercise reasonable diligence" and "must be held chargeable with knowledge of the facts, which it ought, in the exercise of reasonable diligence, to have discovered." *Id.* at 45 n.2 (finding that if a fact material to the cause of action "were discoverable from public records, then MCL 600.5855 would not operate to toll the period of limitations.") (internal quotation omitted); *see also State of Mich. ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 453 (W.D. Mich. 1995) ("A plaintiff . . . must prove that he neither knew nor should have known of his potential claims, despite his due diligence.").

FOR PUBLICATION

For the reasons discussed with regard to the New York causes of action, this Court finds that Plaintiffs do not plead with particularity (a) that Defendants engaged in acts of an "affirmative character designed to prevent subsequent discovery" of the Michigan causes of action, *Dillar*, 308 Mich. App. at 443, (b) that facts material to the causes of action were not publicly available, and (c) that Plaintiffs could not have discovered the Michigan causes of action through the exercise of reasonable diligence. Plaintiffs' claim that a non-disclosure agreement itself is an affirmative act of concealment under Michigan law is unavailing; the case cited by Plaintiffs, *Baker Hughes, Inc. v. S & S Chemical, LLC*, 63 F. Supp. 3d 762, 768 (W.D Mich. 2014), dealt with the Missouri, not Michigan, fraudulent concealment statute. In any event, Plaintiffs do not allege that Defendants agreed to conceal any *material* facts. To the extent that Defendants fraudulently concealed the existence of the No-AG Commitment until 2008, Plaintiffs failed to bring their claims within two years of its public disclosure, as required by Mich. Comp. Laws § 600.5855. The fraudulent concealment statute does not apply. Counts Six and Seven of the amended complaint must be dismissed as untimely.

### C. Counts Eight and Nine: the California claims are time-barred.

Defendants argue that the California state law claims asserted in Counts Eight and Nine of the amended complaint are time-barred. ECF No. 84 at 9-10. Again, this Court agrees.

### 1. The California claims accrued outside the statutes of limitations.

In Count Eight of the amended complaint, Plaintiffs allege that Defendants violated the Cartwright Act, California Bus. & Prof. Code § 16700 et seq., ECF No. 38 ¶ 186, and in Count Nine, Plaintiffs allege that Defendants violated the California UCL, California Bus. & Prof. Code § 17200, et seq. *Id.* ¶ 190. The limitations periods for Cartwright Act and UCL claims are both four years from the date of accrual. California Bus. & Prof. Code §§ 16750.1 (Cartwright

FOR PUBLICATION

Act); 17208 (UCL). The default rule in California is that a cause of action "accrues 'when [it] is complete with all of its elements' – those elements being wrongdoing, harm, and causation." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (Cal. 2013) (quoting *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (Cal. 2011)). As discussed, the elements of Plaintiffs' causes of action were present on August 30, 2006.

Federal and California courts have recently discussed whether several state law exceptions to the default "last element" rule apply to Cartwright Act and UCL claims. The Court finds that these exceptions – the continuing violation doctrine, the continuous accrual doctrine, and the delayed discovery rule – do not apply here.

### a. The continuing violation doctrine and theory of continuous accrual do not apply to the California claims.

California recognizes two "main branches of the continuing-wrong principals:" the "continuing-violation doctrine and the theory of continuous accrual." *DC Comics v. Pacific Ventures Corp.*, 938 F. Supp. 2d 941, 949 (C.D. Cal. 2013) (citing *Aryeh*, 55 Cal. 4th at 1197). The continuing-violation doctrine "applies where there is no *single incident* that can fairly or realistically be identified as the cause of significant harm," *id.* (quoting *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002)) (emphasis in original), and where each incident "may not be actionable on its own." *Aryeh*, 55 Cal. 4th at 1197. Under the doctrine, the court "aggregates a series of wrongs or injuries . . . treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." *Id.* at 1192. This doctrine generally applies to claims that require the demonstration of a pattern of activity, such as Title VII "unlawful employment practice" actions. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1057 (Cal. 2005). Despite Plaintiffs' claim that "it would be unrealistic to expect" them to know about their

33

FOR PUBLICATION

claims until they were overcharged for Lamictal in small amounts over an extended period of

time, ECF No. 89 at 28, the continuing-violation doctrine is inapplicable here, because Plaintiffs

allege that the settlement itself constitutes a discrete, actionable wrong.

When individual incidents are separately actionable, courts may apply the "continuous"

or "continuing accrual" doctrine, which is similar to Michigan's continuing-wrongful-acts

doctrine. Under the continuous accrual doctrine, "[w]hen an obligation or liability arises on a

recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new

limitations period. The continuing accrual rule has been applied in a variety of actions involving

the obligation to make periodic payments under California statutes or regulations." *State ex rel.*

*Metz v. CCC Information Services, Inc.*, 149 Cal. App. 4th 402, 418 (Cal. Ct. App. 2007)

(quoting *Hogar Dulce Hogar v. Community Development Commission*, 110 Cal. App. 4th 1288,

1295 (Cal. Ct. App. 2003)). "To determine whether the continuous accrual doctrine applies [in an

action under the California UCL], we look not to the claim's label as a UCL claim but to the

nature of the obligation allegedly breached." *Aryeh*, 55 Cal. 4th at 1200. Those courts have

refused to apply the continuing accrual rule when the action "does not involve a recurring

obligation or any such periodic payment obligations," but instead alleges that "*every* fraudulent

statement or admission . . . arose out of a single transaction." *Id.* (emphasis in original).

Here Plaintiffs do not allege that the recurring harm – their indirect purchase of

lamotrigine tablets at inflated prices – resulted from any "recurring obligation" of Plaintiffs to

make "periodic payments under California statutes or regulations." Instead, the injuries suffered

by California class members arose out of a single, individually actionable transaction, the

allegedly anticompetitive settlement. This Court will apply neither the continuing-violation

doctrine nor the continuous accrual doctrine.

**b.   The delayed discovery rule does not apply to the California claims.**

Plaintiffs also argue that California's "delayed discovery rule" postponed the accrual of

their claims. The delayed discovery rule "postpones accrual of a cause of action until the plaintiff

discovers, or has reason to discover, the cause of action." *Aryeh*, 55 Cal. 4th at 1193 (quoting

*Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (Cal. 1999)). "A plaintiff has reason to discover a

cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'"

*Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (Cal. 2005) (quoting *Norgart*, 21 Cal.

4th at 398). A plaintiff has "reason to suspect when he has notice or information of

circumstances to put a reasonable person *on inquiry*." *Norgart*, 21 Cal. 4th at 398 (internal

quotations omitted, emphasis in original). The plaintiff "must indeed seek to learn the facts

necessary to bring the cause of action in the first place – he cannot wait for them to find him and

sit on his rights; he must go find them himself if he can and file suit if he does." *Id.* (internal

quotations and citations omitted).

At least one federal district court has held that the delayed discovery rule does not apply

at all to Cartwright Act claims, *Ryan v. Microsoft Corporation*, 2015 WL 1738352, at *16 (N.D.

Cal. April 10, 2015), and this Court cannot find any state court decision holding otherwise. *See*

*also Consortium Info. Servs., Inc. v. Experian Info. Solutions, Inc.*, 2011 WL 1782114, at *5

(Cal. Ct. App. May 10, 2011) (applying default "last element" rule to Cartwright Act claim).

Even accepting, for the sake of argument, Plaintiffs' claim that *Ryan*'s holding was "erroneous,"

the delayed discovery doctrine would afford Plaintiffs in this case no relief. Plaintiffs had

"reason to discover" their cause of action more than four years before they filed the first

complaint. Defendants' SEC filings and press releases, along with the patent court's publicly

FOR PUBLICATION

filed invalidation of the '017 patent, were at least enough to "put a reasonable person on inquiry" of the claims well before 2008. *Norgart*, 21 Cal. 4th at 398.

For UCL actions, the California Supreme Court has held that the applicability of the delayed discovery rule depends on the "nature of the right sued upon . . . and the circumstances attending its invocation." *Aryeh*, 55 Cal. 4th at 1196 (internal citation omitted). This Court need not speculate whether California courts would apply the delayed discovery rule to this particular type of UCL action because, even if the doctrine did apply, it would afford Plaintiffs in this case no relief for the reasons discussed.

### 2. The fraudulent concealment doctrine does not apply to the California claims.

California's fraudulent concealment doctrine, like New York's and Michigan's, tolls the statute of limitations for causes of action that have already accrued. Plaintiffs' California claims were not fraudulently concealed.

In California, "[i]t has long been established that the defendant's fraud in concealing a cause of action against him tolls the statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such a time a plaintiff, by the exercise of reasonable diligence, should have discovered it." *Mark K. v. Roman Catholic Archbishop*, 67 Cal. App. 4th 603, 611 (Cal. Ct. App. 1998) (quoting *Bernson v. Browning-Ferris Industries*, 7 Cal. 4th 926, 931 (Cal. 1994)). "To excuse the late filing of a complaint on the basis of a defendant's fraudulent concealment, the complaint must allege when the fraud was discovered, the circumstances of its discovery, why plaintiff is not at fault for failing to discover the fraud sooner, and that plaintiff 'had no actual or presumptive knowledge of the facts sufficient to put him on inquiry.'" *Bernson*, 7 Cal 4th at 946 (quoting *Kimball v. Pacific Gas & Elec. Co.*, 220 Cal. 203, 215 (Cal. 1934)).

FOR PUBLICATION

"Mere ignorance, *not induced by fraud* of the existence of facts constituting a cause of action does not prevent the running of the statute of limitations." *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (Cal. Ct. App. 1974) (emphasis in original). "[M]ere silence does not constitute concealment in the absence of a fiduciary or confidential relationship between the parties, or 'unless some specially appearing circumstances are shown which of themselves equitably estop a person from relying on his silence or inaction, and which of themselves are sufficient to create on the part of the nonrevealor a positive duty to speak or act. . . .'" *Prudential Home Mortgage Co. v. Superior Court*, 66 Cal. App. 4th 1236, 1252 (Cal. Ct. App. 1998) (quoting *Scafidi v. Western Loan & Bldg. Co.*, 72 Cal. App. 2d 550, 562 (Cal. Ct. App. 1946)). "Affirmative misrepresentations [that] have been held sufficient to invoke the doctrine of fraudulent concealment" include "active misrepresentations or purported disclosures which actually suppress material facts." *Low v. SDI Vendome S.A.*, 2003 WL 25678880, at *5 (C.D. Cal. 2003) (quoting *Baker*, 39 Cal. App. 3d at 319-20, 323).

The fraudulent concealment rule does not toll the limitations period for either of the California causes of action, particularly because the material elements of Plaintiffs' claims were disclosed in public filings. *See*, e.g., *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1410, 1416 (9th Cir. 1987) (refusing to apply fraudulent concealment doctrine in investor suit against defendant brokers, despite defendants' misrepresentations, because the adverse features of plaintiffs' investments had been disclosed through an annual report, letters, and IRS questionnaires). To the extent that Defendants' disclosures fraudulently concealed the existence of the No-AG Commitment, the claims are still time-barred whether the Court accepts Defendants' argument that Teva's July 23, 2008 complaint against GSK revealed the No-AG Commitment terms, ECF No. 91 at 1, or Plaintiffs' argument that the terms were not revealed

37

until GSK filed an actual copy of the settlement agreement on October 6, 2008. ECF No. 89 at 9,

23. Plaintiffs do not explain their failure to bring claims until 2012. *See Bernson*, 7 Cal. 4th at

947 (No fraudulent concealment where plaintiff did "not explain his failure to file suit within one

year after he learned" the facts necessary to bring a claim).

Plaintiffs' claim that timeliness under California law is an issue "not appropriate for

summary disposition," ECF No. 89 at 15, has no bearing when Plaintiffs fail to facially allege the

elements of fraudulent concealment. Counts Eight and Nine are dismissed as time-barred.

### III. Count Five: Plaintiffs Fail to State a Claim under New York's Consumer Protection Statute.

To repeat, Count Five, which charges Defendants with violating New York's consumer

protection statute, N.Y. Gen. Bus. Law § 349, by engaging in a deceptive consumer act, is time-

barred. In any event, Plaintiffs fail to state a valid claim under the statute.

Section 349 of the General Business Law "only applies to anti-competitive conduct that

is premised on the deception of consumers." *State ex rel. Spitzer v. Daicel Chemical Industries,

Ltd.*, 42 A.D. 3d 301, 303 (N.Y. App. Div. 2007) (affirming dismissal of claim on behalf of

indirect purchasers against food additive manufacturer for participating in price-fixing

conspiracy "on the ground that the indirect purchasers . . . are too remote from defendants'

alleged wrongdoing to support such a claim.").

"To state a claim [under § 349], a plaintiff must allege both a deceptive act or practice

and that such act or practice resulted in actual injury to a plaintiff." *In re Packaged Ice Antitrust

Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011) (quoting *In re Wellbutrin XL Antitrust Litig.*,

260 F.R.D. 143, 164 (E.D. Pa. 2009)). Additionally, "[t]o state a consumer protection act claim

under New York General Business Law § 349, [indirect purchaser] Plaintiffs must establish that

the false or deceptive act occurred in New York and was directed at New York consumers." *Id.*

The "deceptive" act or practice must actually be deceptive; "mere anticompetitive

conduct alone will not suffice." *Id.* (quoting *Leider v. Ralfe*, 387 F. Supp. 2d 283, 295-96

(S.D.N.Y. 2005)); *see also In re Automotive Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d

544, 554 (E.D. Pa. 2007) ("[m]ere anticompetitive conduct alone does not constitute deceptive

conduct under § 349 . . . . A number of courts and commentators have observed that the absence

of the reference to unfair competition or unfair practices in § 349 'indicates that anticompetitive

conduct that is not premised on consumer deception is not within the ambit of the statute.'")

(quoting *Leider*, 387 F. Supp. 2d at 295); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL

37534041, at *10 (N.D. Ill. 2009) ("Absent something more, section 349 does not cover price

fixing or other antitrust violations. Anti-competitive conduct alone does not constitute deceptive

conduct under § 349.").

To be sure, anticompetitive conduct *can* violate § 349 if it is deceptive in nature. *See*,

e.g., *In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1010 (E.D. Mich. 2014)

(Plaintiffs stated § 349 claim by alleging that "Defendants took efforts to conceal" their

anticompetitive agreement) (citing *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 148 (N.Y. App.

Div. 2004)); *In re Dynamic Random Access Memory Antitrust Litig.*, 536 F. Supp. 2d 1129,

1143-44 (N.D. Cal. 2008) (Plaintiffs stated § 349 claim by alleging that "defendants secretly

agreed to raise prices" on New York consumers); *Microsoft*, 778 N.Y.S.2d at 148 (Plaintiffs

stated claim for § 349 violation where defendants entered into "secret" anticompetitive

agreements). As explained, the only element of Defendants' settlement agreement that could

arguably be characterized as "secret" or deceptive is the No-AG Commitment.

In any event, "Plaintiffs here do not plead that the alleged fraudulent concealment caused them to pay higher prices for lamotrigine;" the alleged harm was caused by the settlement agreement itself, and any fraudulent concealment simply delayed the filing of the first complaint. ECF No. 84 at 29 n.16. Plaintiffs' remaining allegations involve anti-competitive, but not deceptive, activity; Plaintiffs fail to state a cause of action under N.Y. Gen. Bus. Law § 349. Even if it were not time-barred, Count Five would fail to state a claim.

### IV. Counts Six, Seven, and Ten: Plaintiff IBEW Local 38 Has Standing to Bring Claims under Michigan Law.

Defendants argue that Counts Six, Seven, and the Michigan claim in Count Ten must be dismissed because Plaintiffs fail to plead any cause of action under Michigan law and because none of the named Plaintiffs have Article III standing to bring a Michigan claim. ECF No. 84 at 31-32. Standing to bring a claim under Article III of the Constitution requires:

> (1) an injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007) (citing *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005)). In a class action, "[n]amed plaintiffs are the individuals who seek to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction." *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 364 (3d Cir. 2015) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832 (1999)).

Though the named plaintiff need not demonstrate that all other members of the class have standing before certification, "class representatives must meet Article III standing requirements the moment a complaint is filed." *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)). Named plaintiffs "lack standing to assert claims under the laws of the states in which they do not reside

or in which they suffered no injury." *In re Niaspan*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014)

(quoting *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011)). "It is

not sufficient that the 'injury has been suffered by other, unidentified members of the class to

which they belong and which they purport to represent.'" *Id.* (quoting *Klein v. Gen. Nutrition

Cos.*, 186 F.3d 338, 345 (3d Cir. 1999)).

Here Defendants argue that Plaintiffs lack standing to bring claims under Michigan law

because the amended complaint does not establish that any of the named Plaintiffs either (a)

reside in Michigan or (b) suffered any injury in Michigan. ECF No. 84 at 31-32. Defendants are

correct that Plaintiff IBEW Local 38, the named Plaintiff for the Michigan Indirect Purchaser

Class, is located in Cleveland, Ohio, not Michigan. ECF No. 38 ¶ 19. Defendants are also correct

that the amended complaint never states *directly* that IBEW Local 38 or any of its members were

injured by purchasing lamotrigine tablets in Michigan. But the amended complaint does allege

that IBEW Local 38 reimbursed members who purchased lamotrigine tablets, *id.*, that all

members of the Michigan Indirect Purchaser Class "indirectly purchased or reimbursed for a

purchase of a generic version of Lamictal Tablets from Teva – produced, manufactured,

marketed, sold, or purchased in the state of Michigan," *id.* ¶ 27, and that IBEW Local 38 was

injured by Defendants' conduct "in a manner that was common and typical of the Michigan

Indirect Purchaser Class . . . ." *Id.* ¶ 19. This is enough for IBEW Local 38 to state a cause of

action under Michigan law. The Court will not dismiss the Michigan claims for lack of standing.

### V.  Count Ten: the Unjust Enrichment Claim is Partially Dismissed.

Standing is a problem, however, for Plaintiffs' unjust enrichment claim. In Count Ten,

Plaintiffs allege that "Defendants have violated the common law of unjust enrichment in New

York, Michigan, and California, and the laws of unjust enrichment across all the states and

territories of the United States." ECF No. 38 ¶ 194. With the exception of the New York claim, all of these claims must be dismissed for various reasons.

### A. Plaintiffs do not have standing to assert unjust enrichment claims in "all states and territories."

Plaintiffs do not have standing to bring unjust enrichment claims under the laws of any "states and territories of the United States" other than New York, Michigan, and California. The named Plaintiffs in this case are "held accountable for satisfying jurisdiction," *Neale*, 794 F.3d at 364, and the amended complaint alleges harm to the named Plaintiffs only under the laws of those three states. To the extent that Count Ten states a claim for unjust enrichment under the laws of states other than New York, Michigan, and California, those claims are dismissed.

### B. The New York unjust enrichment claim is timely.

Despite Defendants' challenge, ECF No. 84 at 9 n.5, the New York unjust enrichment claim is not time-barred.

In New York, "the statute of limitations applicable to an unjust enrichment claim depends on the nature of the substantive remedy plaintiff seeks." *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013) (citing *Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266 (N.Y. 1987)). When, as here, plaintiffs assert an "equitable claim for disgorgement," *see* ECF No. 38 ¶ 202, the limitations period is six years. *Id.* (citation omitted); *see also Loengard*, 70 N.Y.2d at 267 (citing N.Y. CPLR § 213(1)). The period begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered." *Matana*, 957 F. Supp. 2d at 494 (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013)).

FOR PUBLICATION

The amended complaint defines the Class Period during which Plaintiffs allege harm as "August 30, 2006, until the effects of Defendants' conduct complained of herein ceased or ceases." ECF No. 38 ¶ 1. During this period, Plaintiffs allege that they overpaid for Lamictal, giving Defendants "financial benefits" that would "inequitable" to retain *Id.* ¶¶ 196-200. Because the entire Class Period falls within the six-year limitations period before the August 12, 2012 filing of the original complaint, Plaintiffs' New York unjust enrichment claim is not time-barred.

### C. The Michigan unjust enrichment claim is untimely.

The Michigan unjust enrichment claim is time-barred. "In an instance where an equitable claim would provide relief that is analogous to the relief available under a similar legal claim, courts generally apply the legal claim's statute of limitations to the equitable claim as well." *Underwood*, 2010 WL 4977977, at *3 (citing *Taxpayers Allied for Constitutional Taxation v. Wayne Co.*, 450 Mich. 119, 127 n.9 (Mich. 1995)). In Michigan, the statute of limitations for unjust enrichment claims is either three or six years, depending on the nature of the underlying or analogous action. *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 474 (D.N.J. 1999) (citing Mich. Comp. Laws §§ 600.5805 (three years to recover "damages for injuries to persons and property"), §§ 600.5087 (six years to recover "damages or sums due for breach of contract")). These sections are generally thought of as the "tort" and "contract" provisions, although a party cannot invoke the six-year breach-of-contract limitations period in an unjust enrichment action "by the mere expedient of calling a tort and implied contract," *id.* (quoting *Fries v. Holland Hitch Co.*, 12 Mich. App. 178, 184 (Mich. Ct. App. 1968)), and, similarly, the six-year limitations period will apply to actions for damages to persons or property "as long as the suit is based on an express promise, and not a duty implied by law." *Id.* (citing *Huhtala v. Travers Ins. Co.*, 401 Mich. 118, 126-27 (Mich. 1977)).

FOR PUBLICATION

Here, Plaintiffs' cause of action is not based on a breach of implied contract or an express promise, but by the breach of Defendants' duties under the Michigan Antitrust Reform Act. Though the issue is not a clean one, the Court finds that the three-year statute of limitations applies to Plaintiffs' Michigan unjust enrichment claim. *See id.* (three-year statute of limitations applied because plaintiff's claims were "not based on an express promise); *Ins. Co. of N. Am. v. Manufacturers Bank of Southfield*, 127 Mich. App. 278 (Mich. Ct. App. 1983) ("Where . . . there is not express contract or express promise and defendants' liability, if any, is implied by law, an action for injury to persons or property is controlled by the three-year statute); *but see In re Britton*, 66 B.R. 572, 575-77 (Bankr. E.D. Mich. 1986) (because unjust enrichment claim for restitution involved "deprivation of money owed" to plaintiff, rather than "specific injury to any particular piece of property or to his person," six-year limitations period, rather than three-year period, applied)).

Plaintiffs allege no harm after Teva's exclusivity period ended and competitors entered the lamotrigine market on January 22, 2009. This is more than three years before they filed the first complaint. ECF No. 38 ¶ 91. To the extent Plaintiffs assert that the Michigan unjust enrichment claim was fraudulently concealed, the court rejects that argument for the reasons earlier discussed with respect to Plaintiffs' other Michigan claims. The Michigan unjust enrichment claim is time-barred.

### D. Unjust enrichment is not a recognized cause of action under California law.

Defendants correctly argue that the California unjust enrichment claim must be dismissed because it is not a recognized independent cause of action. In California, "[u]njust enrichment is not a cause of action, just a restitution claim." *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (Cal. Ct. App. 2011). "There being no actionable wrong" because the Court has dismissed

FOR PUBLICATION

Plaintiffs' remaining California claims, "there is no basis for relief." *Id*. In any event, unjust

enrichment is a "quasi-contract action" governed by California's three-year statute of limitations

for fraud actions. *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1670 (Cal. Ct. App.

1992) (citing *Shain v. Sresovich*, 104 Cal. 402 (Cal. 1894); 3 Witkin, Cal. Procedure § 451, p.

482 (3d ed. 1985)). Because Plaintiffs allege no harm after Teva's exclusivity period ended and

competitors entered the lamotrigine market on January 22, 2009, more than three years before

they filed the first complaint, ECF No. 38 ¶ 91, this claim is untimely.

## CONCLUSION

Defendants' motion for judgment on the pleadings is granted in part and denied in part.

Because Plaintiffs allege justiciable cases or controversies in their federal causes of action,

Counts One, Two, and Three of the amended complaint are not dismissed. Counts Four, Five,

Six, Seven, Eight, and Nine of the amended complaint are dismissed without prejudice as

untimely under the relevant statutes of limitations. Count Ten of the amended complaint is

dismissed without prejudice for all unjust enrichment claims except for those arising under New

York law. An appropriate order follows.

DATE: 22 March 2016

William H. Walls
Senior United States District Court Judge